Argued May 18; affirmed July 9; petition for rehearing denied
September 15, 1948

STATE *v.* BROADHURST

196 P. (2d) 407

*P. J. Gallagher,* of Ontario, and *William Langroise,* of Boise, Idaho, argued the cause for appellant. With them on the brief were Cleve Groome, of Caldwell, Idaho and Gallagher & Gallagher, of Ontario.

*Charles W. Swan,* District Attorney, of Vale, and *Blaine Hallock,* Deputy District Attorney, of Baker, argued the cause and filed a brief for respondent.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY and BRAND, Justices.

ROSSMAN, C. J.

This is an appeal by the defendant from a judgment of the circuit court based upon a verdict which found her guilty of the crime of first degree murder and which, pursuant to the recommendation of the jury (see Constitution of Oregon, Art. I, § 37, and § 23-411 O. C. L. A.), sentenced her to life imprisonment. The

victim of the alleged homicide was one W. D. Broadhurst, to whom the witnesses referred as Dr. Broadhurst. He met his death October 14, 1946, at about 3:30 p. m. on the Idaho-Oregon-Nevada highway, several miles north of Jordan Valley. The death, according to the State, resulted from wounds inflicted feloniously by a heavy wrench and a shotgun. One Alvin Lee Williams struck the blows and fired the gun. The State does not claim that the defendant was present when the crime was committed, but contends that Williams was her proxy and that she was a principal within the purview of § 23-207, O. C. L. A.

The appellant presents 24 assignments of error which her brief groups for the purpose of presentation into 12 contentions. We shall now state five of them. They require a summary of the evidence. The first is:

"Alvin Lee Williams was not competent to testify." Williams and the defendant were separately, not jointly, indicted. The appellant contends that since Williams had neither plead guilty nor been adjudged guilty or innocent, he was not a competent witness. The third contention is:

"The Court erred in overruling appellant's motion for a new trial because of improper remarks of the district attorney."

The attack remarks were a part of the district attorney's opening statement. The defendant contends that they were not justified by the evidence which was later produced. The fifth is:

"The Court erred in not granting appellant's motion for a directed verdict."

The motion was based principally upon a claim that Williams' testimony that he and the appellant con-

spired to kill Dr. Broadhurst was not corroborated. The sixth is:

"The Court erred in refusing to grant the defendant a new trial."

The chief basis of that contention are arguments (a) that the State presented no evidence of a conspiracy between the appellant and Williams except the testimony of the latter; (b) that Williams shot in self-defense; and (c) that Williams' testimony disproved that Dr. Broadhurst was murdered. The twelfth is:

"The verdict is against the weight and preponderance of the evidence."

A disposition of the foregoing five contentions requires mention of some of the evidence. The latter is extensive. The trial began February 24, 1947, and was not concluded until March 14, 1947. Our review of the evidence will be confined to essentials. The State contends that the defendant married Dr. Broadhurst for his wealth; that three months later she won the affection of Williams and then used him as her instrument in the killing. A few days before the homicide Dr. Broadhurst executed a will which bequeathed his entire estate to the defendant. The latter neither testified nor called a witness, and, hence, the testimony came exclusively from the State's witnesses.

Dr. Broadhurst lived upon a ranch which he owned, three miles from Caldwell, Idaho. Caldwell is 15 miles or so east of Oregon. Dr. Broadhurst, in addition to owning the Caldwell ranch, owned another near Jordan Valley, Oregon, which is south and west of Caldwell. He was 51 years of age, unmarried and worth about $200,000. Upon the Caldwell ranch was a house in which Dr. Broadhurst had made his home. About a year prior to his death he gave the use of the home to Dr.

and Mrs. F. L. Adams and lived with them. Dr. Adams was a nephew of Dr. Broadhurst.

In the early 1920s Dr. Broadhurst and the defendant lived in Burley, Idaho, and became acquainted. How long they lived there and to what extent they saw anything of each other is not disclosed by the record, but Dr. Broadhurst found the defendant attractive. In 1942 she gave her age as 32; in May of 1946 she represented it as 35; four months later she reported it as 30. Each occasion was an application for a marriage license.

When Dr. Broadhurst left Burley is not disclosed by the record and likewise we do not know when the defendant left there. We know nothing about what either did after leaving Burley until we reach the summer of 1945. However, on January 28, 1942, the defendant was married to Leslie M. Lincoln who, in 1941, was commissioned a lieutenant in the Army. Lieutenant Lincoln was discharged in 1944. In the summer of 1945 the defendant was living in Taft, California, with her husband, and Dr. Broadhurst was upon his ranches. About that time the two occasionally communicated with each other. A telegram which Dr. Broadhurst sent to the defendant August 25, 1945, said:

"Same address Dr. W. D. Broadhurst, Caldwell, Idaho. Best wishes."

In the same month he wrote to her, according to a witness's recollection of the letter:

"In answer to your question, I am not married; therefore I have no heirs and no dependents."

The contents of other communications which were exchanged before marriage were excluded by adverse rulings.

In January, 1946, Dr. Broadhurst and his sister, Mrs. Sarah Allen, made a trip into Arizona, California and Mexico. He returned February 28. In its course he and the defendant communicated with each other. May 19, 1946, the two met at Reno, Nevada, and were married. The next day Dr. Broadhurst returned to his Caldwell ranch. The defendant did not accompany him.. The application for the marriage license, which was signed by both, contained the following questions concerning the defendant: "Previously married?" "Husband deceased?" Both questions were answered in the affirmative, but the answer to the second question was false. No one claims that Dr. Broadhurst knew that it was false. Lt. Lincoln was alive when that answer was made and when this case was tried. Dr. Broadhurst did not know, when death overtook him, that the woman whom he deemed his wife was in truth the wife of another man. May 20, 1946, when Dr. Broadhurst returned to Caldwell, the defendant returned to Lt. Lincoln and resumed her conjugal relations with him. April 24, 1946, 26 days prior to her return to him, Lincoln had filed a suit against the defendant for a divorce in which he charged cruel treatment. Five days after the suit was filed a reconciliation occurred and was still in effect on May 19, 1946, when the defendant and Dr. Broadhurst were married. June 2, 1946, Lincoln discovered that his wife and Dr. Broadhurst were married on May 19 and thereupon separated from her. July 8, 1946, he filed an amended complaint in which he alleged the bigamous marriage. October 25, 1946, 11 days after the death of Dr. Broadhurst, an interlocutory decree was entered in the divorce suit in favor of Lincoln. The decree did not become final until one year after that date.

The defendant had an aunt, Mary Johnson, who lived in the Hawaiian Islands. In August of 1945, about the same time that Dr. Broadhurst sent the defendant the aforementioned telegram, the defendant claimed that her aunt had died and left her three million dollars. Later she repeated that statement many times. When the trial occurred Mary Johnson was alive.

About the time of her marriage to Dr. Broadhurst the defendant began to assert that Lt. Lincoln was killed in England while in the military service and that he had a twin brother who was identical in appearance to him, with the exception that the twin had a birthmark over the left ear. Lt. Lincoln's given name was Leslie. The defendant claimed that the purported twin's name was Lester. According to her, Lester had also served as a lieutenant in the Army and, whereas her purported deceased husband had a good disposition, Lester was vicious, brutal and psychopathic. She said that the twin had repeatedly threatened her, had beaten her upon more than one occasion and that, upon learning that the defendant had inherited three million dollars, wanted to take the place of Leslie who, as we have seen, she claimed was dead.

The mother and sister of Lt. Leslie Lincoln swore that he was alive, that he never had a brother, twin or otherwise, and that he had a birthmark over his left ear. From the record, the jury was warranted in believing that Dr. Broadhurst was deceived by the twin brother story and that he feared that the purported Lester would harm the woman whom he deemed his wife. It will be recalled that immediately after the marriage to the defendant May 19, 1946, Dr. Broadhurst returned to Caldwell. A few days thereafter he wrote a letter to the defendant, who was then in

Sacramento, in which he referred to the purported twin brother as "that brute." We now quote from the letter:

"I bet you had another mix-up with *that brute.* I want you to get out of that town. I had thought you could go to Long Beach down to your cousins for a time and surely you could find a room eventually there. Now pack what you have, you leave no forwarding address, buy your ticket part way and then rebuy another. By no means leave any clue as to your whereabouts and by no means have any correspondence to Sacramento . . . give them the slip until I can get some place for us to live, better get out as soon as possible . . . please honey, get away from there . . . get away from all that fear . . . I want you to get away as soon as possible, change address at postoffice and do not allow any mail to go out to 2228½ H Street. Should have been a detective. I wonder if I could get Sacramento to deputize me this fall and I'll get *that dirty brute.*"

As we said, the defendant did not accompany Dr. Broadhurst when, following the marriage of May 19, he returned to Caldwell. June 20 she wrote a letter addressed to "Dear Dr. Adams and Family" in which she referred to Dr. Broadhurst as Dr. Broady, and said:

"Doc, I have a serious problem, I must get word to my husband Dr. Broady at once, that I am seriously ill with blood poisoning in my left leg and before the decision is made to take off said foot I feel that my husband Dr. Broady should be here to say yes or no * * * I know he is busy and on roundup but if I die he wouldn't be able to stand it . * * *.

"Did Dr. Broady tell you about my Aunt Mary Ralphs Johnson who died last August in Honolulu, T. H. She left Dr. and I nearly three million dollars plus my own departed parents estate now

in probation. The Hawaiian estate will be through probation about 1st of the year, so you can see Broady need not work himself to death.''

From that letter and other evidence the jury could reasonably have inferred that before Dr. Broadhurst and the defendant were married the defendant told him the false Aunt Mary story.

Following the writing of the letter from which we just quoted Dr. Broadhurst went to Sacramento and brought the defendant to the Caldwell ranch June 27. The evidence indicates that when she reached the ranch she was not afflicted with blood poisoning but was the victim of addiction to a nerve sedative known as nembutal, commonly called sleeping pills. Such was the testimony of Dr. Thomas A. Magnum, a physician who was called by Dr. Broadhurst to attend her after she reached Caldwell. The defendant and Dr. Broadhurst went to the Jordan Valley ranch June 29 and while she was there the sheriff of Canyon County, Idaho, that being the county in which Caldwell is located, sought unsuccessfully to serve her with process in the divorce suit instituted by Lincoln. Evidently it was not known that she was in this state at the Jordan Valley ranch. August 3 the defendant announced that she had to return to California and explained that it was necessary for her to go there on account of probate proceedings. She told Dr. Adams that while in California she would purchase a ranch as a surprise gift for Dr. Broadhurst. She represented that she would be gone for about a week and not more than two. In order to facilitate the defendant's trip, Dr. Broadhurst, who was puzzled over the situation, gave her the use of an automobile and, since she was unable to drive, employed the aforementioned Williams to act as her

chauffeur. Williams was then 23 years of age and was in Dr. Broadhurst's employ as a ranch hand. Dr. Broadhurst trusted him, and each deemed the other a friend. The State claims that the defendant's real reason for going to California was the suit for divorce and concern lest information about it would reach Dr. Broadhurst.

August 5, 1946, with Williams as chauffeur, the defendant left for California. The first night after she and Williams left Caldwell was spent by the two in the automobile in Reno, Nevada. While they were there in the car at night the defendant, according to Williams, asked him if she might kiss him. His testimony continued:

"Q. What effect did that have upon you, Mr. Williams?

"A. That didn't have much effect, but the next one did."

The defendant had a brother who operated an automobile camp near Truckee, California, known as the Big Chief Auto Camp. The night of August 6 was spent by the defendant and Williams in that camp. The two were assigned to different cabins, but after Williams had gone to bed the defendant came to his cabin and asked him to secure for her some articles which were in the automobile. Shortly she told him that she was afraid to sleep alone and asked him to sleep with her in her bed. From that time on the two occupied the same bed every night during the trip. September 17, 1946, the two went to Reno and were married. For the purpose of that marriage the defendant assumed the false name of Elaine Hamilton. They did not return to Caldwell until September 22. In the meantime, they registered as husband and wife

in various hotels and automobile camps in several cities and places.

In the interval of August 5 to September 23 the defendant and Williams drove around the country and amused themselves. The defendant wrote Dr. Broadhurst several letters couched in endearing terms. In at least one of them she mentioned court appearances in such a way that her statement could readily be construed to mean that she was attending to the purported probating of the three million dollar estate. She promised that she would return home "as quickly as I get things straight here."

While the defendant and Williams were in Sacramento they were encountered by a process server who sought to serve the summons in Lincoln's divorce suit. Williams met the official's inquiries with a statement that he was Dr. Broadhurst. But the service was made. While in Sacramento the defendant had a visit with her husband, Lt. Lincoln, and some communications with his attorney. She made a call upon an attorney whom she employed to represent her in the suit. She introduced Williams to Lt. Lincoln, but represented the latter as the twin of her purported deceased husband.

In the early part of September Dr. Broadhurst, upon her request, visited the defendant at the Big Chief Auto Camp for three days. When he returned to his ranch the defendant did not accompany him. The record contains no suggestion that Dr. Broadhurst knew of the defendant's marriage to Williams nor of their meretricious relationship. One of the defendant's letters to Dr. Broadhurst, which began with the salutation, "Darling Daddy Dearest," said, concerning Williams, "He has been very nice to me. I'm glad you chose him as he is honest and decent."

The State contends that while the defendant and Williams were in California the two plotted the murder of Dr. Broadhurst and the manner in which Williams should execute the deed. It contends that the defendant was the instigator and took the lead throughout. Williams swore that he had no grievance against Dr. Broadhurst and that he regarded the latter as a friend. We shall now mention briefly the part of the evidence which concerns the alleged conspiracy. When the defendant and Williams were at the Big Chief Auto Camp they attended a motion picture performance which, as described by Williams, told the story of a married proprietor of a cafe who hired a young man to work for him and was killed by his employee after the latter had fallen in love with his wife. According to Williams, the defendant remarked as they left the show, "Too bad something like that can't happen to the Doctor." According to Williams, that was the first time, so he swore, the subject of the taking of Dr. Broadhurst's life was mentioned. Continuing, Williams testified:

"She asked me if I had any idea of how the Doctor could be disposed of and I said no I hadn't, didn't have no definite ideas. I said, however, he might get lost while he was hunting for cattle, and, well, she said if he did get lost he would have to not never be found."

Williams swore that the defendant spoke to him frequently upon the subject of bringing about the death of Dr. Broadhurst. She told him, so he claimed, that Dr. Broadhurst was more animal than man and that he was cruel to her. She sought to justify the killing by resort to the Ten Commandments. If Dr. Broadhurst was cruel to the defendant or treated her in any manner except an affectionate and indulgent one, no

one mentioned the fact, unless it can be gathered from the remark attributed by Williams to the defendant, of which we have taken note.

At first while their plot was forming the would-be partners in crime planned that Williams should accompany Dr. Broadhurst into a remote area in search of livestock and there kill him. Further discussions brought forth other ideas. The plan which Williams put into effect October 14 was not devised until after the two had returned to the Caldwell ranch. According to him:

"She asked me how I was going to — if the Doctor was going to ride for cattle, how I was going to get out in the hills in order for the Doctor to come up missing and I told her that I might ride for the Doctor, that I might get a job riding, and she says, 'Well, we have got to go through with every—we have to go through everything and check and recheck on it.' "

The defendant asked Dr. Broadhurst to save a job for Williams upon the range.

During the times mentioned in the language just quoted Williams was acting as chauffeur. He, however, told the defendant of his strong attachment for livestock and ranch life. While he was in the Big Chief Camp the defendant's brother permitted him to participate in a rodeo and he was awarded a prize. While in California he wore the attire of a cowboy, including the large hat. He even acquired a mustache and a goatee. The defendant asked him, so Williams swore, if he could manage the Broadhurst ranches in the event Dr. Broadhurst "came up missing." We quote from his testimony:

"We discussed if he were to come up missing that I could go on being the chauffeur for a certain

length of time and after that length of time, if he was not found, he would be pronounced dead and all of the estate would automatically change over to her and then after that her and I was to get married, and have a public marriage.''

It is apparent from the record that Williams was infatuated with the defendant. He said that he ''would do pretty near anything to get her.'' He realized that his marriage to her was not regular and was anxious that it should be valid. Referring to the defendant's marriage to Dr. Broadhurst, he testified: ''I thought eventually that she would have her freedom,'' but added that Dr. Broadhurst would not give it to her. He believed that the murder of Dr. Broadhurst was the only solution, but had suggested to the defendant that they leave the Idaho country completely. He had even thought of going away by himself. We now quote from his cross-examination:

''Q. What did you kill the Doctor for?
''A. I don't know.''

The evidence warranted the inference, if the jury drew it, that it was Williams' infatuation with the defendant, whereby he became her pawn, which caused him to kill.

The final plan to kill Dr. Broadhurst had not taken shape when the defendant and Williams returned to Caldwell September 22. They were slow in returning to the Caldwell home. On the way north they made a visit to the home of an uncle of the defendant in Winnemucca, Nevada. Then they bypassed Caldwell and drove on beyond it to Ontario, Oregon, where they spent two nights. While in Ontario they rode about the country attending dances and motion picture per-

formances. However, they returned home September 22 at 11:30 p. m.

September 23 when Dr. Broadhurst ate breakfast the defendant greeted him with a kiss but ate her breakfast later with Williams. When the latter and the defendant went to California August 5 Williams was a ranch hand temporarily working upon the Jordan Valley ranch, but when he returned he took up his abode in the Broadhurst home and generally ate breakfast with Mrs. Broadhurst. It seems that he even slept with her many nights. He said: "I wasn't complaining any."

September 23, the day following the defendant's return, Dr. Broadhurst opened a joint bank account in the amount of $1,000 in the name of himself and the defendant. On September 24 the defendant spoke to Dr. Broadhurst about a will. At that time Dr. Broadhurst was planning to join a hunting expedition, and on the 24th, scarcely a day after her return home, the defendant, so Dr. Adams swore, told Dr. Broadhurst that if his life should be lost while he was hunting she would not have money with which to discharge the burial expenses. The next day she told Dr. Adams, according to his testimony: "I am afraid that lawyer isn't going to get that will out before the Doctor goes hunting." September 25 Dr. Broadhurst executed a will which named as its executrix the defendant and gave the entire estate to "my beloved wife, Gladys Elaine Broadhurst." A paragraph follows:

> "I do not intend to give anything from my said estate to any of my brothers or sisters or to any of my other relatives. It is my desire that they shall receive nothing from my estate."

The evidence shows that Dr. Broadhurst and at least

one of his sisters deemed each other in affectionate regard. An attesting witness to the will was one Cleve Groome, an attorney who practices in Idaho and who represents the defendant upon this appeal.

After their return to Caldwell the defendant, according to Williams, asked him to "stay around there and keep in touch with her." September 27 Dr. Broadhurst, Dr. Adams and some friends left upon the hunting expedition and did not return for two weeks. The night before his departure the defendant told Williams of Dr. Broadhurst's intentions and asked him to come to the house the next morning. He did so. Mrs. Adams swore that when Williams entered the home the defendant put him in her (the defendant's) bed, claiming that he had a cold. She then gave him a sponge bath and a pair of Dr. Broadhurst's pajamas. From that day on until the hunters returned Williams occupied a bedroom in the Broadhurst home and the defendant used an adjacent connecting bedroom. The two kept their clothes in the defendant's room and dressed and undressed in it. Mrs. Adams testified that she saw the two kiss one another and saw the defendant sit in Williams' lap. The two ate breakfast together each day and then drove away in the Broadhurst car. They attended dances and motion picture performances. At least one call was made at Mr. Groome's office. According to Mrs. Adams, it was the defendant who daily planned the activities which she and Williams pursued. Referring to the two, she said: "He always took her suggestions * * *. She always told him what clothes to wear, in fact, she told him everything he did."

Williams testified that while Dr. Broadhurst was absent on the hunting expedition he and the defendant

worked out the final plans of their murder compact. They believed that shortly after Dr. Broadhurst would return home he would go to the Jordan Valley ranch and in so doing travel upon the Oregon-Idaho-Nevada highway. They thought that at some spot along the highway Williams would be able to induce Dr. Broadhurst to stop and that the spot would provide Williams with opportunity to kill him. We quote from Williams' testimony:

> "She asked me if I couldn't wait along the road between Caldwell ranch and the Jordan Valley ranch and have him stop and I was to hit him, knock him unconscious and then destroy the body, move him away some place where he would never be found, and after I had moved him, I was to shoot him or plug him or anyway to make sure that he would never be, that he would never come back."

In its final form the machination required Williams to station himself and a car at the junction of the highway and a road known as the Succor Creek road. The plan was that he should raise the hood of his car and pretend that his motor was disabled. It was thought that when Dr. Broadhurst approached the place he would stop, offer assistance, and bend over the motor for the purpose of making adjustments. At that juncture, according to their plan, Williams should strike Dr. Broadhurst over the head with a wrench and then shoot him.

By the time Dr. Broadhurst had gone upon the hunting expedition the defendant had made use of the twin-brother story and, according to Williams, a part of the conspiracy was to attribute the killing to the fictitious scapegoat.

In order to reach the spot just mentioned and carry out the plan, Williams needed an automobile, but had

none. Throughout all of the above-mentioned time he drove a car which belonged to Dr. Broadhurst. About a week before the latter returned from the hunting trip Williams inquired of a dealer concerning a car. The purchase was not effected, but shortly he went to a friend who owned a green Model A Ford coupe for which he asked $200. Williams purchased it with money supplied by the defendant. It was in that car that Williams rode to the spot where he killed Dr. Broadhurst. He used its raised hood to lure Dr. Broadhurst to stop. At least two witnesses saw it at the death rendezvous. Williams' testimony concerning the purchase of the car with money given him by the defendant was corroborated, not only by the two car owners, but also by Mrs. Adams. The latter testified, in part:

"They had gone to Boise to find a car for Williams and when they returned they hadn't found anything suitable, so they went in to Caldwell and upon their return they said they had found two that he was interested in, so we had dinner and as soon as we had eaten, the defendant said that he had better go back and see about the car. She said: 'You will need your wages, you know where the money is, go help yourself.' He went into the bedroom and was gone for a few minutes and came out and went to town."

Shortly he brought the Model A Ford to the house.

In the tool compartment of the automobile which Williams purchased was a heavy wrench. That fact was mentioned, not only by Williams, but also by the former owner of the car. With that wrench Williams struck Dr. Broadhurst upon the head. A witness who saw Williams lying in wait for Dr. Broadhurst, with the hood of the car raised, saw the wrench. In order

to carry out the plan, a gun was needed. The home of Williams' parents was near Parma, Idaho, and in it was a shotgun. October 6 Williams and the defendant drove to the parents' home in Dr. Broadhurst's car and the two entered. While there Williams got the shotgun and a bedroll. His testimony to that effect was corroborated by his father and sister who saw both the defendant and Williams enter the home and remain there thirty minutes. These witnesses swore that when the defendant and Williams left they had the gun and bedroll. After Williams had struck Dr. Broadhurst with the wrench he shot him in the chest with his shotgun. After the homicide the bedroll was found in Williams' Ford auto. The shotgun was found in a gopher hole where Williams had concealed it. Williams slept upon the bedroll at the junction the night before the homicide.

As the day drew near when he would be called upon to kill the man who had befriended him, Williams began to doubt his will power. He testified:

"Well, I had told her (the defendant) that I didn't know whether I could go through with that or not, that I couldn't stand the sight of human blood and she asked me if whisky would help me. I said yes, that whisky would help settle my nerves and—but I told her I didn't have any liquor permit for I had torn mine up, so she went and bought a permit for herself in Caldwell and she got me some whisky."

According to an exhibit before us, the Idaho State Liquor Dispensary issued a permit to the defendant October 3, 1946, at its Caldwell office. On the same day, according to another exhibit, she purchased a quart of liquor. Liquor was found in the Williams car when it was seized by the peace officers.

October 11 the hunting party returned. Sunday, October 13, Dr. Broadhurst told the defendant that he would go to his Jordan Valley ranch Monday morning. According to Mrs. Adams, the defendant appeared perturbed and flustered when she received the information. About 11:00 p. m. the defendant gave the news to Williams and he then left the Broadhurst home. He swore that the defendant's final plea to him was, "Get up there, be there when he gets there, and for God sake don't miss."

When Williams left upon his sanguinary mission he drove away in the Model A Ford. In it was the shotgun, wrench, bedroll and a quart bottle and a half of whisky. After he had visited a restaurant he drove to the Succor Creek junction, parked his car, spread out his bedroll and went to sleep. At six in the morning he awoke, raised the hood of his car and took up his vigil. Dr. Broadhurst, instead of leaving for the ranch in the morning as he had planned, did not depart until the early afternoon and did not reach the junction until 3:30 p. m. Williams remained there constantly.

Joseph Fenwick, owner of a ranch which was about two miles north of the junction, had an employee, Clifford Dickson, with whom he was burning sagebrush upon a tract a mile south of the junction. Monday, October 14, at 8:00 a. m., the two drove through the junction toward the place where they were burning the sagebrush and saw parked there a Model A Ford coupe in which a man was seated. The car was green in color and its hood was raised. At 11:45 a. m. they passed through the junction on their way to Fenwick's ranch to get lunch. The car was still there; the man was still seated in it, and the hood was still up. At 1:00 p. m. Dickson again drove south through the junction on his way back to work and, seeing that the

car was still there with its hood up, stopped for the purpose of offering assistance. When he spoke to Williams he saw a large wrench. Presently he drove on. At about 4:00 p. m. while we was working he heard a shot which he thought came from the vicinity of the junction. When he drove through the junction at 6:00 p. m. the car was gone.

About 3:30 Dr. Broadhurst approached the junction. He was driving a pick-up truck to which was attached a trailer containing his riding horse. When Williams observed the approaching car he busied himself about his motor.

As was anticipated, Dr. Broadhurst stopped and offered assistance. Williams explained to Dr. Broadhurst that the gas line of his car was clogged, with the result that Dr. Broadhurst obtained from his car a pair of pliers. When he bent over the motor, Williams saw that the moment had come for him to strike the lethal blow. His wrench was in his hands. At that juncture he looked up and down the road and saw no one in sight, but his courage faltered. We now quote from his testimony:

> "I tried to quit then, and I seemed to hear a voice saying, 'Don't fail me! Don't fail me! If you do, for God sakes don't come back,' and I hit him."

The blow caused Dr. Broadhurst to stagger and blood to flow. Presently Dr. Broadhurst, according to Williams, seemed to recover himself, and asked, "What hit me, Al?" Williams replied, so he swore as a witness, "I don't know Doc." Then, according to him,

> "I made up my mind I was going to get out of there just as quick as I could, and I went and got my shirt out of my car and I folded it up and

handed it to him, and told him to hold that on his head, maybe that would stop the flow of blood. * * * And I put the hood down on my car and I picked up the wrench, carried it around, started to get in the car.''

At that point Dr. Broadhurst recovered himself, if Williams told the truth, and exclaimed, ''I am going to kill you'' and, wielding a jackknife, approached Williams. We quote again from the latter:

"I reached in the car and grabbed my shotgun and it was loaded, and I pulled it out of the car, I just swung around,—the gun was right by my side —I hollered, 'Don't Doc', and he didn't stop. I couldn't get away from him. I was standing right against the car and I shot.''

Dr. Broadhurst fell to the pavement and Williams dragged his body over the side of the road into a concealing thicket of sagebrush. He next drove Dr. Broadhurst's pick-up truck with its attached trailer two or three miles into an unused side road. There he abandoned the truck, released the horse and rode him part way back to his car. He hitched the horse to a clump of sagebrush in a remote spot and ran back to his car. Having done all of this, he drove away to await darkness. After nightfall he loaded Dr. Broadhurst's body into his Ford and hauled it to an unfrequented area in Idaho where he dumped it in a lonely gulch. All of that having been done, he returned to the Broadhurst home and reported to the defendant, who greeted him with the inquiry as to whether he had disposed of the evidence. Pursuant to instructions she gave him, he took to the highway again, concealed his gun and burned his bloody clothing. Then he again returned to the Broadhurst home and went to bed.

An autopsy disclosed three severe head wounds and several bullet wounds in Dr. Broadhurst's chest. A great deal of blood was found upon the pavement at the aforementioned intersection.

Monday, the day of the murder, was spent by the defendant in bed. She said that she had sinus trouble. In the afternoon she told Mrs. Adams that she had had "an argument or quarrel with a person in Caldwell named Red Wells and that she was afraid this Red Wells would follow him (Dr. Broadhurst) out to the range and do him some injury." According to the record, Red Wells was a friend of Dr. Broadhurst and neither the latter nor the defendant had had any trouble with him.

Monday evening L. C. Krall, a friend of Dr. Broadhurst, while driving along the Idaho-Oregon-Nevada highway near the Succor Creek junction, encountered Dr. Broadhurst's horse. Fearing that something untoward had happened, he telephoned to the defendant and told her what he had found. She replied, "Well, I am worried," and hung up the receiver. She did not relate the telephone conversation to the Adamses until they inquired of her. After the telephone conversation with the defendant, Krall instituted a search for Dr. Broadhurst and presently found the pick-up truck and trailer. Tuesday morning at seven he again telephoned to the defendant. Upon receiving his message, she replied, "You found the pick-up truck?" and hung up the receiver.

Monday evening when Mrs. Adams went to the defendant's room to call her to the telephone she found it almost impossible to arouse her. When she called the defendant to the telephone Tuesday morning she observed that the defendant seemed unable to hear,

and likewise she found it difficult to understand what the defendant was saying. The defendant, upon leaving her bed for the telephone, "seemed unable to walk by herself" according to Mrs. Adams. Tuesday morning Dr. Adams joined the searching party and Mrs. Adams went to Caldwell to take care of his office. Before going she asked Dr. Thomas A. Magnum, whom we have already mentioned, to visit the defendant. The physician described the defendant's condition thus:

"Nervous and seemed to be somewhat anxious or worried, and she was lamenting, trying to tell me a story of Dr. Broadhurst being lost, a story which was incoherent, and I couldn't bet much about it. * * * I immediately thought of her being a nembutal addict."

Although Tuesday, October 15, many ranchers and peace officers searched the area around the junction for Dr. Broadhurst, neither the defendant nor Williams joined the parties. When the defendant went to bed Tuesday night at 10:00 p. m. she had requested no one to render assistance. She and Williams had spent most of the day together. Williams employed part of the time in painting his car, thereby changing its color from green to black. He traded its tires and wheels for a set of larger dimensions. The tires which had been upon it were small and had left distinct marks at the scene of the crime, thereby enabling the searchers to identify the car used by the murderer. He also removed the "turtle back" of his car. A part, at least, of these alterations were suggested by the defendant who told Williams, according to him, that the changes would render it more difficult to recognize his car. She supplied $30 with which he paid the difference in cost of the tires and wheels.

Tuesday at 9:00 p. m. the aforementioned Red Wells telephoned to the defendant and said he would join the searching parties if she could get him to the junction. The defendant was uninterested and told Mrs. Adams that she did not trust Wells. When Mrs. Adams volunteered to drive Wells to the junction and asked for the car keys, the defendant demurred.

Dr. Adams returned home Wednesday morning after having spent all of Tuesday and Tuesday night with searching parties. The defendant did not ask him for news, but suggested to Williams that they ought to join the search in order to allay suspicion. About nine o'clock that morning she went with the Adamses to the scene of the search. Williams was not in the Broadhurst home at that moment but the defendant left for him a note reading:

"Dear Allen: Have gone with Doc and Lola. Here are the keys. Please bring the car. Gladys."

After the defendant and the Adamses reached the scene Williams came in the Broadhurst car. Shortly he entered the automobile in which the defendant and Mrs. Adams were seated. According to Mrs. Adams, the defendant told Williams: "They found a green Model A coupe Ford car out there on Monday morning and had seen it sitting there nearly all day. * * * There wasn't anything to it, there were a million cars that answer to that description." Presently, so Mrs. Adams swore, the defendant said to her: "He may have been kidnapped or he may have given someone a ride." She again mentioned Red Wells and claimed that Dr. Broadhurst had had trouble with him over a money matter. About this time the defendant, according to Mrs. Adams, cautioned Williams that he ought to

mingle with the searchers. Mrs. Adams swore that
the defendant told her:

"She knew Al (Williams) couldn't have done it,
because she knew where he was every minute on
Monday and she said anyway he isn't strong
enough."

She described Williams as being afraid of the sight
of blood and mentioned a purported instance when
the appearance of it caused him to faint.

Wednesday evening and a part of Thursday morn-
ing were spent by the defendant upon old letters. She
gathered them from three rooms in the house, re-read
them and assorted them into piles. After her arrest,
as we shall later indicate, they could not be found.

While the defendant was at the scene of the search
the officers sought to keep her and Williams apart.
Presently she asked that Williams be permitted to
drive her in the Broadhurst car to the Jordan Valley
ranch. This was denied, but one of the officers, R. W.
O'Brien, drove her to the ranch. Upon the trip she
told O'Brien that Williams and Dr. Broadhurst were
like brothers. She accounted, so O'Brien swore, for
Williams' presence every hour of Sunday and Mon-
day. She suggested kidnapping as a possible cause
for Dr. Broadhurst's disappearance, and in explana-
tion, said: "It is rumored that I brought three million
dollars back from California, but it wasn't that much."
Then she related the twin brother story and described
that purported scapegoat as evil minded and constantly
seeking to substitute himself for her purportedly de-
ceased husband. She told the officer that Dr. Broad-
hurst and Red Wells had had a serious argument and
intimated that Wells may have ambushed Dr. Broad-
hurst.

When O'Brien returned with the defendant from the Jordan Valley ranch he introduced her to Charles W. Glenn, sheriff of Malheur County, Oregon. According to Glenn, the defendant told him that she and Dr. Broadhurst had been in love with each other for more than twenty years before they were married; that she had recently inherited three million dollars; that her long stay in California was due to the probating of the estate; that she could account for all of Williams' time on Sunday and Monday; that Dr. Broadhurst commonly carried large sums of money on his person and may have been kidnapped; and that Red Wells was indebted to Dr. Broadhurst on two transactions and that Dr. Broadhurst tried on Monday, the day of his disappearance, to make Wells pay.

Wednesday afternoon Sheriff Glenn took Williams into custody. Williams at once made use of the twin brother story and told it to Glenn. About that time the sheriff was encountered by the defendant, and we now quote from him:

"I had just purchased some gas there at the station, was on the inside paying for it, when the defendant walked in. She asked me if we were through with Mr. Williams. I told her no. She says, 'Are you holding him as a suspect?' And I says, 'We are holding him for questioning.' And she asked me again, said she had to have him to drive her car, said she also needed him for the cattle."

Williams was not released, but was shortly lodged in the county jail at Vale. The homicide occurred in Malheur county, of which Vale is the county seat.

A neighbor, George Vogt, brought the defendant home Wednesday afternoon from the scene of the search. According to him, she inquired earnestly why

the officers had taken Williams into custody and depicted him as Dr. Broadhurst's best friend. She blamed the killing upon the fictitious twin brother of her purportedly deceased husband and showed Vogt a photograph of Leslie, claiming that it was of the purported twin. While she was telling the twin brother story, she declared: "I have just been living in hell for fear," and said that Lester threatened to kill her if she married Dr. Broadhurst. Mr. Vogt took her to Mr. A. A. Moline, sheriff of the county in which Caldwell is located, so that she could relate her story to him. She told Moline that Williams did not commit the crime and that he had no motive to take Dr. Broadhurst's life. Going on, she blamed the homicide upon the purported twin, Lester, and recounted threats which she claimed he had made. She told the sheriff that a two million dollar estate had been bequeathed to her and that Lester was trying to take the place of her purportedly deceased husband. According to what she told Mr. Moline, Lester, the purported twin, was in Caldwell shortly prior to the murder.

Mrs. Grace Mowrey, a neighbor, who regarded Dr. Broadhurst "like a son," called upon the defendant Wednesday evening, October 16, to offer sympathy. Mrs. Mowrey described the manner in which the defendant kept busy during the visit sorting letters, and swore that the defendant displayed no emotion whatever until she (the defendant) presently declared: "What worries me the worst now is that they have arrested my very best friend." The defendant told Mrs. Mowrey that Williams was "just as innocent as can be. * * * I could swear he worked right here around the barn all day Monday. * * * Al wouldn't have killed the Doc, he just loved Dr. Broadhurst."

We have mentioned Dr. Broadhurst's sister, Mrs. Allen. She lived in Eastern Idaho, but, upon receipt of information of her brother's disappearance, rushed to his home and reached there Thursday. Upon her arrival she saw the defendant sort old letters. We quote from her testimony:

> "When I asked her who could have done such a thing, she said it just laid between two people, 'my dead husband's twin brother, Lincoln, or the fellow at the stock ranch by the name of Red Wells, because he and the Doctor had had a fight over some money Red Wells owed the Doctor.'"

Thursday, the 17th, at 9:00 a. m. while the defendant was sorting letters, she rushed to Mrs. Adams with a a note which she declared had just been thrust under the front door. The note read:

> "Your cowboy strongarm didn't do it, but don't start anything or I'll get you same as I did Doctor. I warned you and I need some cash. Sweet Pea."

The defendant claimed that the purported twin brother (Lester) was known as Sweet Pea. When she showed the note to Mrs. Adams she said that she saw Lester in Caldwell recently and that at that time he threatened both her and Dr. Broadhurst.

The State presented evidence, the sufficiency of which is not challenged, showing that the Sweet Pea note was written by the defendant in her own handwriting and upon stationery of which she had a supply. The note was upon paper from which the lower portion had been torn off. After the defendant's arrest there were found under the register in the warm air duct of the defendant's room several torn letters, a quantity of stationery of the same kind as that upon which the Sweet Pea note was written, and the lower part of

the sheet upon which the note was written. Its torn edge matches perfectly with the edge of the lower part of the note.

Upon Mrs. Adams' suggestion, she and the defendant took the Sweet Pea note to Sheriff Moline. The defendant told the sheriff the twin-brother story and declared that she recently saw Lester in Caldwell. She showed the sheriff a photograph upon which she had written, "1st Lt. Lester Melvin Lincoln, Les' twin brother." It was, in fact, a photo of Leslie, the man she married January 28, 1942. According to her narrative to the sheriff, she was certain that the Sweet Pea note was in Lester's handwriting. She mentioned to that official Lester's frequent purported threats to kill her.

About 4:00 p. m. Thursday, Mr. Cleve Groome, the attorney we have mentioned, called at the Broadhurst home and shortly he and the defendant drove away. The two did not return until about 11:30 p. m. Rufus Lanphear, a young man who lived in Parma, testified that the defendant and Groome called upon him Thursday afternoon, October 17, and that he accompanied them to Sheriff Glenn who had Williams in the Malheur County jail. We explain that at the outset it was not known whether the homicide occurred in Idaho or in Oregon, and that circumstance accounts for the activities of the two sheriffs. Mr. Glenn was sheriff of Malheur County, Oregon, and Mr. Moline was sheriff of Canyon County, Idaho. Lanphear swore that, although his words were false, he told Glenn, in the presence of the defendant and Groome, that Williams was at his home in Parma October 14 at about 2:00 p. m.

Although the defendant, Groome and Lanphear called upon Sheriff Glenn in the late afternoon, Glenn

was unable to listen to them until in the evening. In the meantime, unbeknown to his three visitors, the sheriff and the district attorney for Malheur County, Mr. E. Otis Smith, were receiving a statement from Williams and were having a court reporter, who had made stenographic notes of it, transcribe it. At the conclusion of that matter Glenn and Smith listened to their three visitors. After Lanphear had told the officials that Williams was at his home Monday at about 2:00 p. m., the defendant declared, "Yes, he would have had to have an aeroplane to be there", that is, at the scene of the murder. Since the defendant, Groome and Lanphear did not know at that time that Williams had made a statement and in it had fixed the hour of the homicide as at 3:00 p. m., and the place as the Succor Creek road junction, the State attaches significance to the defendant's quoted remark. As the interview progressed, the defendant told the two officials the twin brother story, the inheritance episode and her account about the professed Sweet Pea note. She told them that Lester, the fictitious twin, came to Caldwell in a Chevrolet auto immediately prior to Dr. Broadhurst's departure upon his hunting trip and that at that time he threatened to kill both her and Dr. Broadhurst. She described Lester as a psychopathic who was discharged from the service as incurable, and, in corroboration of her description of him as a dangerous character, produced the letter which Dr. Broadhurst wrote to her shortly after his return home following their marriage, and from which we quoted in a preceding paragraph.

After Williams had made the statement mentioned in the preceding paragraph he accompanied the officers upon a journey in the course of which he brought them to the spot where lay the body of Dr. Broadhurst,

and then to the gopher hole in which they found his shotgun.

Clarence Mullinix, a rancher, swore that on Thursday or Friday following the murder the defendant and Groome called upon him and that at their request he accompanied them to Sheaville, which is a place a few miles from the scene of the homicide. While there some one told the three that Williams had confessed. Upon receipt of that information, the defendant "looked sad, and had quite a stare in her eyes", so this witness testified. Going on, he said that when they left Sheaville they stopped at the scene of the crime. He and Groome got out of the car at that place, but the defendant displayed no interest.

Saturday, October 19, the defendant was taken into custody. Tuesday, the 22d, she arranged matters so that Sheriff Moline of Canyon County, Idaho, and one of his deputies by the name of Hale took her to the Broadhurst home under a representation that "she wished to get some clothes and some other personal articles." Mr. Groome, the aforementioned attorney, accompanied them. We now quote from Mr. Moline's testimony:

"A. I left her there in company with Cleve Groome and my deputy, Hale, for a few minutes.

"Q. Now, in addition to the clothes and personal effects what else was taken by the defendant at that time?

"A. Well, there was letters and some other personal articles in her bedroom, and then she went into Doctor Broadhurst's room and she moved what appeared to be a ledger and a lot of personal papers which she claimed pertained to the ranch—I didn't look at them—but I advised her this: that if she took those papers with her into the jail they would

be subject to search, and looked over. So Mr. Groome says that he would take them.

"Q. And did he take them?

"A. Yes."

Thereafter, although the Adamses searched their home thoroughly, they were able to find virtually none of the letters which previously were there. The letters were correspondence between the defendant and Dr. Broadhurst.

The foregoing statement, although incomplete, will enable us to state our disposition of the contentions advanced by the defendant and mentioned in a preceding paragraph.

■ The first contention which we shall consider is:

"Alvin Lee Williams was not competent to testify."

He was indicted separately from the defendant and his indictment was still pending when he testified. The defendant cites three sections of our laws of which we shall now take notice.

Section 26-924 says:

"When two or more persons are charged in the same indictment, the court may, at any time before the defendant has gone into his defense, on the application of the district attorney, direct any defendant to be discharged from the indictment, so that he may be a witness for the state."

Section 26-925 provides:

"When two or more persons are charged in the same indictment, and the court is of opinion that, in regard to a particular defendant, there is not sufficient evidence to put him on his defense, it must, if requested by another defendant then on trial, order him to be discharged from the indict-

ment, before the evidence is closed, that he may be a witness for his codefendant.''

Those two sections are applicable only to the trial of co-indictees. Although none of our statutes expressly say that a co-indictee is not a competent witness in the trial of the other defendant, the two sections just quoted assume his incompetency so long as the charge pends against him.

■ Section 26-934 says:

''In the trial of our examination upon all indictments, complaints, information, and other proceedings before any court, magistrate, jury, grand jury, or other tribunal, against persons accused or charged with the commission of crimes or offenses, the person so charged or accused shall, at his own request, but not otherwise, be deemed a competent witness, the credit to be given to his testimony being left solely to the jury, under the instructions of the court, * * *.''

The obvious purpose of that enactment is to enable a person accused of a crime to testify. Unlike §§ 26-924 and 26-925, it does not confine itself to the trial of co-indictees but is applicable in all criminal proceedings. Prior to its adoption, an accused was ineligible to the witness stand. It renders him eligible by exacting of him nothing more than a request to be permitted to testify and the witness's oath. Section 26-934, as we shall shortly show, was enacted in 1880, but when it was adopted §§ 26-924 and 26-925, which were already a part of our laws, were not repealed.

*Latshaw v. Territory,* 1 Or. 140, which was decided in 1854, held that no error was committed when the trial court ruled that a coindictee, who had been neither convicted nor acquitted, was incompetent to testify in behalf of his codefendant. Statutes of Oregon 1854,

being an enactment of the legislative assembly which convened December 5, 1853, contained Chapter 36, Sections 3 and 4, which were respectively substantially the same as §§ 26-924 and 26-925, O. C. L. A., previously quoted. At that time there was no provision similar to § 26-934, and the court deemed that a person against whom an indictment was pending was an incompetent witness.

The enactments of 1864 (see General Laws of Oregon 1843-1872, page 361, chap. 16, § 166) provided:

"A defendant in a criminal action or proceeding, cannot be a witness for or against himself, nor for or against his codefendant, except as provided in Sections 162 and 163."

The two sections just mentioned are now §§ 26-924 and 26-925, O. C. L. A. The language just quoted was a statutory distillation of the underlying holding of the Latshaw decision.

In 1880 there was adopted the provision which is now § 26-934, O. C. L. A. (see Laws 1880, page 28). That enactment repealed the provision quoted in the preceding paragraph. Shortly after Laws 1880, page 28, were adopted this court decided *State v. Drake,* 11 Or. 396, and said concerning the provision which is now § 26-934:

"The effect of this amendment was only to remove the disqualification of the person charged and on trial, and to make him, at his own request, but not otherwise, a competent witness. There is no reference, whatever, to co-defendants not on trial, * * *. We are satisfied that the amendment cited did not affect the disqualification of co-defendant, not on trial, as a witness. He remains, under the code as at common law, in a criminal case, incompetent to testify * * *."

In that case the defendant and the wouldbe witness were joint indictees. *State v. Hale,* 141 Or. 332, 18 P. (2d) 219; *State v. Chapin,* 74 Or. 346, 144 P. 1187; *State v. Goff,* 71 Or. 352, 142 P. 564; *State v. Case,* 61 Or. 265, 122 P. 304, and *State v. White,* 48 Or. 416, 87 P. 137, followed the views expressed in the Drake decision. All of those were instances of joint indictees.

■ It will be observed that when the cases cited in the last paragraph were decided there was in effect in this state, as there is now, § 26-934 which permits all accused persons to testify, and also §§ 26-924 and 26-925 which assume the incompetency of a joint indictee so long as the indictment pends against him. In the face of that statutory inconsistency, two possibilities were present: (1) hold that § 26-934, by implication, repealed §§ 26-924 and 26-925; (2) hold that § 26-934 is inapplicable to a joint indictee so long as the indictment pends against him. Repeals by implication are not favored. The course suggested by number two was taken. The decisions of this court, which holds a coindictee incompetent as long as no disposition has been made of the charge against him, are classified by Wigmore on Evidence, 3d Ed., § 580, footnotes 12 and 13, as standing virtually alone. That learned treatise concludes its discussion concerning the competency of joint indictees by declaring:

"There ought to-day to be no further question in any jurisdiction (except Georgia) that there is no limitation whatever on the qualification of a co-indictee or co-defendant to testify either for or against the accused."

■ Sections 26-924 and 26-925 do not mention persons who are separately indicted for the same crime. At common law such persons were competent witnesses for or against the accused: Wigmore on Evidence, 3d

Ed., § 580. Underhill's Criminal Evidence, 4th Ed., § 153, says:

> "The general common-law rule is that accomplices are competent witnesses against their criminal associates. Clearly, where persons are separately indicted for the same crime, their testimony is admissible for the state, though the charges are still pending against them."

Wharton's Criminal Evidence, 11th Ed., § 1209, states:

> "Where accomplices are indicted separately, they are competent witnesses either against or for each other."

We observe that 22 C. J. S., Criminal Law, § 803, p. 1376, says:

> "A person who is charged by separate indictment or information for the same crime with which an accused on trial is charged may be a competent witness for the prosecution."

See, also, 16 C. J., Criminal Law, § 1411, p. 690.

A Congressional enactment (28 U. S. C. A. 632) is substantially similar to § 26-934, O. C. L. A. In *Wolfson v. United States,* 41 C. C. A. 422, 101 Fed. 430, the court, referring to the statute, said:

> "This statute in terms makes a defendant a competent witness. The statute does not say 'a competent witness for himself.' It does not say 'a competent witness for the government.' He is made simply 'at his own request, but not otherwise' a competent witness. * * * The purpose of the law was to make defendants competent witnesses, but at the same time to preserve to them the right to remain silent without prejudice. When any defendant chooses to testify, the statute permits him to do so. It does not matter whether his testimony is for or against himself, or for or against his co-defendant."

Other courts, in the construction of similar legislation, have taken the same view. See Wigmore on Evidence, 3d Ed., § 580, subd. B.

In *Ex parte Stice,* 70 Cal. 51, 11 P. 459, the court construed legislation similar to ours and held that an accused separately indicted for the crime charged against the person on trial was a competent witness.

■ We are satisfied that the adoption of § 26-934, O. C. L. A., was unnecessary to render Williams a competent witness. He was eligible to the witness stand under common law standards and regardless of that act. Williams was, therefore, a competent witness for or against the State, unless some provision of our laws which we have not so far mentioned excluded him from the witness stand. Sections 26-924 and 26-925 are applicable only to joint indictees and, therefore, did not affect Williams. Section 3-102, O. C. L. A., says:

> "All persons without exception, except as otherwise provided in this chapter, who having organs of sense can perceive, and perceiving can make known their perceptions to others, may be witnesses. Therefore, neither parties nor other persons who have an interest in the event of an action, suit or proceeding are excluded; nor those who have been convicted of crime * * *."

Section 3-103 excludes from the witness stand people of unsound mind and infants, but Williams was not a person of that kind. Section 26-932 says:

> "The law of evidence in civil actions is also the law of evidence in criminal actions and proceedings, except as otherwise specially provided in this Code."

■ The defendant, by quotation from the decisions of other jurisdictions, shows that in some, legislation

which deems a co-defendant incompetent finds its basis in public policy; in other jurisdictions it is viewed as a measure for the prevention of perjury, and in still others it is thought that the codefendant would be more likely as a witness to be prompted by self-interest than by a desire to tell the truth. Whatever may be the reason which supports such legislation, it must be addressed to the legislative branch, for this court cannot enact statutes. We are satisfied that this state has no law which deems a person who is separately indicted for the same crime as the person on trial, incompetent either for or against the state. To the contrary, § 3-102, O. C. L. A., which is rendered applicable to criminal cases by § 26-932, renders him competent.

We resolve this contention against the defendant.

■ We shall now consider the third contention advanced by the defendant, which is:

"The Court erred in overruling appellant's motion for a new trial because of improper remarks of the district attorney."

This contention is based upon the opening statement to the jury which was made for the State by Mr. Blaine Hallock, deputy district attorney. The following, taken from the appellant's brief, quotes most of the statement to which the appellant objects:

"Sometime in the summer of 1945, the Defendant conceived the idea of getting Dr. Broadhurst and his money." * * *

"Now, it is the State's contention and I think it will be proved to your satisfaction, that to attract a man of that kind it was conceived by the Defendant that she would have to have good looks, some social background, wealth—and certainly could not be encumbered with a husband—she being married at

that time. So in August of 1945, when the Defendant was residing in Taft, California, with her husband, Leslie Merl Lincoln, she concocted two very fanciful stories, and here is what they are, and this is what the State will prove: one of them was that her Aunt, Mary Johnson, an elderly lady living over in the Hawaiian Islands had died in the year 1945 and had left her a vast fortune—something like 3 million dollars.

"With these stories I shall tell you as to what she did with them in so far as concerns Doctor Broadhurst, and I am going to take the liberty of following my memorandum rather closely, because I want to be accurate in these matters. She contacted Doctor Broadhurst by telegrams and letters.

"In some of the letters and telegrams the Defendant represented herself to be what I have just indicated, that she possessed these talents, was not bad looking, could cook and play the piano, and she had inherited this large fortune from her Aunt, Mary Johnson, of Honolulu.

\* \* \*

"On the occasion of this trip the Doctor was again contacted by the Defendant and in one of the letters she proposed marriage to him.

"The testimony will disclose that he was completely fooled by these stories that the Defendant had told him, particularly with respect to the existence of this supposed twin brother of her supposed or alleged, or represented, deceased husband. Because of what defendant had represented to Doctor Broadhurst with respect to the vicious character of this supposed twin brother who, she said, was pursuing her—.

\* \* \*

"During the interval, the testimony will disclose, the Defendant persuaded Doctor Broadhurst to make his will, and that on September 25, which is three days after she and Williams had returned to the Caldwell ranch and two days before Doctor

Broadhurst went on the elk hunt, he made a will and he left his entire estate to—and I quote from the Will.

\* \* \*

"The testimony will disclose that she bought whiskey for him and that he had it on the occasion when the act was finally consummated.

\* \* \*

"That afternoon—Thursday, October 17—the Defendant, in company with Mr. Groome, drove over to Parma, Idaho, where the Defendant explained to a man by the name of Rufus Lanphear that she must have an alibi for Williams and must be able to show that he was not at the scene of the crime on Monday, October 14, and Lanphear concluded that he could support such an alibi and so, with the Defendant and Groome, he came to the courthouse at Vale, and they requested an audience with Sheriff Glenn."

We quote the following from *State v. Albert*, 159 Or. 667, 82 P. (2d) 689:

"It is not intended that merely because an attorney in his opening statement asserts that he will offer proof of a certain state of facts and upon attempting to do so is prevented by an adverse ruling of the trial court, we would hold that error was thereby committed. On the contrary, if the question of its admissibility is a close one and the attorney making the statement acts in good faith, error cannot be predicated upon the mere making of the statement to the jury."

Both parties quote approvingly the following taken from 53 Am. Jur., Trial, § 457:

"The courts recognize that proof frequently fails to come up to expectation; the tendency is therefore to permit counsel a reasonable latitude in stating to the jury the facts proposed to be shown. Hence, in the absence of substantial error, the action

of counsel in good faith in referring in his opening statement to matters subsequently not proved cannot be questioned. However, as soon as it can be demonstrated that they cannot be substantiated, such statements should be withdrawn. It is, of course, true that counsel in referring to matters which he subsequently does not attempt to prove may be guilty of inexcusable misconduct prejudicial to the opposing side, justifying, in the case of proper objection, a new trial or a reversal.''

The appellant claims:

''Here, Counsel makes statements based on letters that appellant was alleged to have written to the deceased. No such letters were introduced. * * * Counsel, who had been preparing for the trial of this case for months, knew that there was no evidence to support this startling statement. * * * Many such misstatements of fact appear from a comparison of the statements and the transcript, but we have pointed out sufficient to show that Counsel was not acting in good faith when he made them. * * * If that letter had in fact ever existed and was then in the custody of appellant, Counsel knew he had no right to compel its production.''

In denying the motion for a new trial, which was predicated in part upon the matters now under consideration, the trial judge evidently believed that the district attorney was prompted by good faith when he made his statement. In preceding paragraphs we reviewed much of the evidence. We believe that it sufficiently paralleled the opening statement so as to sustain the district attorney's good faith, with the exception of the following, which we shall now consider:

''Now, it is the State's contention, and I think it will be proved to your satisfaction, that to attract a

man of that kind it was conceived by the Defendant that she would have to have good looks, some social background, wealth—and certainly could not be encumbered with a husband—she being married at that time. * * *

"In some of the letters and telegrams the Defendant represented herself to be what I have just indicated, that she possessed these talents, was not bad looking, could cook and play the piano, and she had inherited this large fortune from her Aunt, Mary Johnson, of Honolulu. * * *

"On the occasion of this trip the Doctor was again contacted by the Defendant and in one of the letters she proposed marriage to him."

It will be noticed that the part of the opening statement which we just quoted depended for its support upon letters and telegrams.

We have mentioned Dr. Broadhurst's sister, Mrs. Sarah Allen, and the fact that she and he made a trip in January and February, 1946. In its course they were in Phoenix, Arizona. By that time, as stated in previous paragraphs, the defendant and Dr. Broadhurst were engaged in correspondence. Mrs. Allen swore that while Dr. Broadhurst was in Phoenix he received a letter from the defendant, asked her to read it and that she did so. The State's brief, referring to this letter, says:

"As the record will disclose, the State made timely demand upon defendant for the production of certain documents including 'Item 4 Letter from Gladys Lincoln to Doctor Broadhurst at Phoenix, Arizona, in January or February, 1946, describing her personal qualifications and proposing marriage to Doctor Broadhurst.'"

The appellant's reply brief says:

"Counsel now attempts to justify the statement made as to the contents of the letters he spoke about.

> He alludes to a motion, by the State, to produce one of the letters he now claims he referred to in his opening statements. If that letter had in fact ever existed and was then in the custody of appellant, Counsel knew he had no right to compel its production."

Those statements warrant a conclusion that a notice to produce the letter was duly given, but the notice is not in the record and was not mentioned at the trial.

Mrs. Allen, after testifying that she read the letter, swore that she recalled its contents. She said that she joined the Adamses in their search for Dr. Broadhurst's missing letters and papers, but that the search did not uncover the letter in question. Then she was asked: "Will you state the contents of that letter as nearly as you can recall it?" Appellant's counsel objected: "Pure hearsay, no foundation laid; not shown to be acquainted with the handwriting of the defendant." The objection was sustained. Upon further questioning it developed that Mrs. Allen was familiar with the handwriting of the defendant and that she believed that the letter in question was in the defendant's handwriting. Then the district attorney renewed the question. The objection to it was lengthy and from it we quote the following: "Particularly because there is no foundation laid for this witness to give secondary evidence as to the contents of the document." No claim was made that the course which the district attorney was pursuing violated the privilege against self-crimination. The objection was sustained. Although a part of the proceedings attendant upon the objections aforementioned were conducted in chambers, the defendant's counsel made no claim that she did not possess the letter nor that she had not received timely notice to produce it.

Section 2-810, O. C. L. A., says:

"The original writing shall be produced and proved except as provided in section 2-212. If the writing be in the custody of the adverse party, he must first have reasonable notice to produce it. If he then fail to do so, the contents of the writing may be proved as in case of its loss; * * *."

From Wigmore on Evidence, 3d Ed., § 1207, we take the following:

"That the documents are subject to the *privilege against self-crimination* is in itself no excuse; for the opponent might choose to produce without exercising the privilege, and until notice has been given it cannot be known whether he will do so. But whether that privilege positively prohibits giving the notice is a different question, considered *post,* § 1209 and § 2268."

From § 1209, we now quote:

" * * * That the mere *giving of the notice* is itself a violation of the privilege, is a heresy examined *post,* § 2268."

Section 2268 of the same treatise states:

"Where, however, the accused, though not taking the stand, possesses *documents* which the prosecution desires to use, the prosecution may of course give *notice to produce,* without violating the privilege. This is because the accused's privilege as to his personal testimony is separate from his privilege as to his documents; and it cannot be known, until the notice, whether he is to claim the latter privilege. Moreover, the prosecution must give notice to produce, in order to authorize its later resort to a copy (*ante,* §§ 1205, 1207), and its use of a copy is concededly not a violation of the privilege. * * *
" * * * First, the mere *failure to produce* the document at the trial is sufficient to satisfy the rule requiring notice (*ante,* § 1209). No *demand* at the

trial is necessary and therefore no refusal is necessary. A prosecutor desiring to use a copy is therefore entitled to do so (under the rule for copies) by merely notifying the accused before trial (which is not made known to the jury) that it will be wanted, and then by asking the accused's counsel at the trial, 'Have you the document here?' and being answered, 'No, we have not.'"

In 20 Am. Jur., Evidence, § 448, it is said:

"The majority of courts treat an incriminating document shown to be in the possession of the defendant as inaccessible to the state and permit secondary evidence of its contents without prior notice to produce. A few jurisdictions adhere to the view that secondary evidence of an incriminating document in the possession of the defendant is admissible only when a proper foundation has been laid by giving the defendant reasonable notice to produce the original. Some courts create an exception to the rule requiring notice to the defendant to produce an incriminating document in his possession, before secondary evidence is admissible, when the indictment discloses that proof of the paper will be necessary at the trial, in which case no further notice is required."

From 22 C. J. S., Criminal Law, § 706, p. 1199, we quote:

"As a general rule, where a writing is in the possession or custody of accused, it is regarded as inaccessible to the state, as accused cannot be compelled to give evidence against himself by being required to produce it, and secondary evidence of the contents thereof is accordingly admissible. While it is generally not a prerequisite to the introduction of secondary evidence in such a case that accused be given notice to produce the original writing, notice is required in some jurisdictions, unless the case comes within a common-law or statutory exception to the rule, as, for instance, where the plead-

ings disclose that proof of the writing will be necessary at the trial, or where accused denies possession of the writing. In both classes of jurisdictions a showing that the primary evidence in question is in the possession or custody of accused, that he has been given notice to produce, and that he has failed or refused to comply with the notice, constitutes a sufficient foundation for the admission of secondary evidence.''

This court has sustained rulings made by the circuit court which permitted the prosecution to offer secondary evidence of the contents of documents which were in possession of the accused: *State v. Brumfield*, 104 Or. 506, 209 P. 120, and *State v. Leasia*, 45 Or. 410, 78 P. 328.

■ The contention under consideration does not require us to delineate the rules governing (a) notice to produce, and (b) the reception of secondary evidence of the contents of documents possessed by the accused. We need go no further than to determine whether the district attorney had good cause to believe, when he made his opening statement concerning the letters, that he would be permitted to introduce evidence concerning their contents. We cannot say that the district attorney was prompted by bad faith; to the contrary, it appears that he had good reason to believe that the evidence upon which he depended would be ruled admissible. We believe that in making his opening statement he was prompted by good faith. We, therefore, find this contention lacking in merit.

■ Since the arguments submitted by the defendant in support of the fifth and sixth contentions partially overlap, we shall consider them together. The fifth is:

''The Court erred in not granting appellant's motion for a directed verdict.''

The sixth is:

"The Court erred in refusing to grant the defendant a new trial."

In support of the fifth contention, the defendant's brief argues:

"There is not a word of testimony in the record tending to prove a conspiracy, other than the testimony of Williams."

In support of the sixth contention, the defendant's brief submits the following propositions:

(1) That there was no evidence of a conspiracy.

(2) That there was no evidence corroborating the testimony of Williams.

(3) That the testimony of Williams proves that he shot in self-defense.

(4) That Williams' testimony as to how the homicide occurred was binding upon the State.

We shall first consider the claim that Williams' testimony was not corroborated. Section 2-1001, O. C. L. A., says that the jury shall be instructed that "the testimony of an accomplice ought to be viewed with distrust" and § 26-939 says:

"A conviction can not be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and the corroboration is not sufficient if it merely show the commission of the crime, or the circumstances of the commission."

In the recent decision of *State v. Jeannet,* 183 Or. 354, 192 P. (2d) 983, we said:

"Assuming, without deciding, that decedent's husband was an accomplice, we think that, aside from his testimony, there was substantial testimony upon which the jury could base a finding that the

corpus delicti has been proved. As to the corroboration of his testimony, we should bear in mind that 'the corroboration necessary to sustain the testimony of an accomplice need not go to the full extent of establishing the crime beyond a reasonable doubt, wholly independent of the confederate's testimony. It is only necessary to corroborate him in material particulars. If the rule were otherwise, the testimony of the accomplice might as well be excluded as so much surplusage.' State v. Haynes, 120 Or. 573, 577, 253 P. 7, 9.''

*State v. Reynolds,* 160 Or. 445, 86 P. (2d) 413, and *State v. Brake,* 99 Or. 310, 195 P. 583, extensively analyzed the requirements made by § 26-939, O. C. L. A. From the Reynolds decision, we quote:

"Further, as the foregoing authorities show, the corroborative evidence need not be direct evidence, but the statute is satisfied even though the evidence is entirely circumstantial. The corroboration need not be of itself adequate to support a conviction, but it is sufficient to meet the requirements of the statute if it fairly and legitimately tends to connect the defendant with the commission of the crime."

In the Brake decision it is said:

"Intimate association with the accomplice, however, at or about the time of the commission of the crime, and in the neighborhood of the place where the crime was committed, may sometimes be sufficient * * *."

The defendant's brief argues:

"There were only three circumstances shown by the record which could have any bearing on the existence of such a conspiracy: (1) Her adulterous relations with Williams; (2) her presence with Williams when he got the shot gun from his father's home; (3) the fact that Williams bought an automobile."

Although we think that the three facts just mentioned are important corroboration of the accomplice's testimony, we do not believe that they were the only corroborative facts.

We think that groups of facts corroborated Williams' testimony, which may be classified as follows:

(1) The defendant's unlawful relationship with Williams whereby he was drawn into complete submission to her power.

(2) Acts performed by the defendant in preparation for the commission of the crime.

(3) The promptings of the defendant which caused the victim of the crime, Dr. Broadhurst, to make a will in her favor whereby she would receive the fruits of the crime.

(4) The defendant's fabrication of evidence.

(5) The defendant's destruction of evidence.

(6) The defendant's lack of emotion when she received information indicating that something untoward had happened to Dr. Broadhurst, and likewise her belated interest in the search.

We shall now consider briefly facts which we grouped in the foregoing manner. The first concerns what we termed the defendant's unlawful relationship with Williams.

The defendant was evidently 35 years or more of age when she and Williams met. He was 23. The defendant, according to the brief submitted by her counsel, "had married several times before her marriage to the deceased." When she met Williams she had at least two husbands from whom she was undivorced. She knew that Dr. Broadhurst trusted Williams. Yet notwithstanding those facts, she bestowed amorous attention upon Williams the first night of her trip with him. The second night she continued

her advances, with the result that they spent the night in her bed. It is evident that Williams was a simple youth readily susceptible to influence. Before long the two underwent a marriage ceremony. The defendant, for the purposes of the marriage, assumed a false name and presently threw away the marriage certificate—circumstances hostile to an implication that she entered into the marriage for the purposes which should govern such a relationship. In the meantime, this simple youth was enjoying, through her intervention, the luxury of a prolonged vacation accompanied with such bizarre features as the use of an automobile owned by his trusting employer, wages and expense money paid to him regularly by the man whom he was wronging, and a mistress whom both he and Dr. Broadhurst mistakenly assumed was the latter's wife. Before long this simple youth had become so thoroughly enamored of his mistress that he did everything that she suggested. Access to the fleshpots had made him the slave of his mistress. Surely a court need not be so naive as to assume that the defendant regarded her relationship with Williams in the same light as he, her gull, regarded it. The man on the bench, like the man in the street, can properly reason that the defendant had skillfully maneuvered Williams into her power so that eventually she could make him her partner in the dance Macabre which would usher Dr. Broadhurst to his doom. She had no less marked him her victim than she had Dr. Broadhurst. Both were the dupes of treasonous love.

Very likely she reasoned that if there were no blood upon her hands the State would have no evidence against her, but failed to take into account

"For murder though it have no tongue, will speak
With most miraculous organ."

The lawless relationship and the manner in which she consummated it was an organ which speaks as effectively as if blood from Dr. Broadhurst's battered body stained her hands. The boldness which she displayed upon returning to the Broadhurst home can not be left out of account. In the presence of Mrs. Adams she put Williams into her (the defendant's) bed, gave him a pair of Dr. Broadhurst's pajamas and a sponge bath. The next day she was seen sitting upon Williams' lap and giving him a kiss while the two were in the home. Even after Dr. Broadhurst returned the defendant ate breakfast with Williams and ignored the man who thought that she was his wife. She made Williams a preferred member of the household. We shall not recount further details. This boldness was undoubtedly intended to deceive Williams into a belief that he held her affection to a greater extent than did Dr. Broadhurst and to make him bold when the fatal hour would come for him to take Dr. Broadhurst's life. The intimate relationship was continued down to the hour when he left upon his gory errand and was resumed before he had a chance to wipe his victim's blood from his hands.

We go on now to the second group of facts which we think corroborate Williams' testimony, that is, the defendant's part in the preparation for the murder. These acts consisted of the following: (1) financing the purchase of the automobile; (2) helping Williams procure the shotgun; (3) helping Williams procure the bedroll upon which he slept at the scene of the murder the night before it was committed; (4) purchasing whisky which Williams deemed necessary to sustain his willpower; and (5) marriage to Williams in order that he might be deceived into a belief that he would eventually share in the fruits of the crime: (a) a legal

marriage with defendant, and (b) an interest in the ranches.

Our third group of corroborating facts is entitled promptings put forth by the defendant to induce Dr. Broadhurst to make a will in her favor. It is inconceivable that the defendant would have committed this horrible crime without a motive. The will bequeathed to her an estate having a value of about $200,000, and in order to make doubly sure that she would receive it, employed two clauses stating that no one but the defendant should receive anything from the estate. The will referred to the defendant as "my beloved wife, Gladys Elaine Broadhurst", thus showing that Dr. Broadhurst remained deceived in the belief that she was, in fact, his wife.

We shall treat together the fourth and fifth groups of facts, that is, the fabrication and destruction of evidence. Facts showing that an accused fabricated or suppressed evidence are circumstantial evidence which are not only admissible, but which are frequently deemed possessed of a high degree of potency: Underhill, Criminal Evidence, 4th ed., § 237; Wigmore on Evidence, 3d ed., § 277; *State v. Jennings,* 48 Or. 483, 87 P. 524, 89 P. 421; and *State v. Reinhart,* 26 Or. 466, 38 P. 822. We shall not review the numerous circumstances detailed by the witnesses which show that the moment the defendant began to see that Williams and herself were under suspicion she fabricated and suppressed evidence. The Sweet Pea note, her efforts to cast suspicion upon Red Wells, to induce the officers to search for the nonexistent twin brother, and her suppression of letters which were previously in the Broadhurst home suffice for our purposes.

The last group of facts which we enumerated in

the preceding paragraph are concerned with the defendant's failure to display emotion. When Krall telephoned her that he found Dr. Broadhurst's horse wandering riderless upon the roadway, her interest was meager, and she hung up the receiver before the conversation was completed. She did not give the disconcerting news to the Adamses until they inquired of her. The faithful Krall, whose reactions were the normal ones of a friend who senses that a mishap has befallen a neighbor, continued the search all night and called to his aid other ranchers. When Mrs. Mowrey, the good soul, visited the defendant and expressed sympathy, she was struck by the fact that the defendant displayed no emotion except over the fact that Williams was suspected of being the murderer. Although Dr. Adams abandoned his office Tuesday morning, and the countryside joined in the search, the defendant displayed no interest in the developments until it occurred to her that her absence from the ranks of the searchers might be construed as evidence of guilt. Human beings generally run true to form, and it is difficult for the guilty to simulate the conduct of the innocent. While others were trying to fathom the mystery, find the body and preserve the evidence, the defendant was endeavoring to shield the guilty, to throw the officers off the scent, to fabricate evidence and to secrete letters. She could simulate emotion in the only manner that was possible for her—by taking, Monday, an overdose of sleeping pills.

We are satisfied that Williams' testimony was sufficiently corroborated to meet the requirements of § 26-939, O. C. L. A.

■ Finally, under this contention the defendant argues that the testimony of Williams shows that he

shot in self-defense and that Williams' testimony is binding upon the State. She, therefore, claims that the crime of murder was not committed.

In a preceding paragraph we showed that Williams swore that he struck Dr. Broadhurst only once with the wrench. He claimed that at that juncture he underwent a change of heart and decided to quit. His actual words were: "I had quit. * * * I decided I was going to leave the country right away." By reverting to the preceding paragraph, the testimony can be read upon which the defendant depends for a contention that two affrays occurred at the Succor Creek junction: (a) one in which Williams was the aggressor, and (b) a second in which Dr. Broadhurst was the aggressor. The defendant claims that Williams abandoned the first before the second purported affray was begun.

Dr. Joseph Beeman, whose qualifications are admitted, performed an autopsy upon Dr. Broadhurst's remains. He found three wounds upon the forehead. One was three-eighths of an inch in diameter, another was an inch and a half in diameter. He said: "This wound had gone down to the skull." The third wound "was one and five-eighths of an inch long and three-fourths of an inch wide." According to the witness it "had gone through the skull and had torn the frontal part * * * had fractured the skull bone over the right eye." We call attention to the fact that two of the blows penetrated the skull and that one of them fractured the skull bone. Dr. Beeman testified that the shotgun wounds were in the right chest. We quote from him:

"He had the shotgun wounds in his right chest which was going from left to right, just slightly upwards and slightly backwards."

There are before us as exhibits photographs of the remains of Dr. Broadhurst which were taken by Dr. Beeman. One of the photographs shows the shot wounds. In order to show the latter, Dr. Broadhurst's arm was raised above his head. Six shot entered the right armpit or close to it. It will be remembered that Williams swore that after he struck Dr. Broadhurst on the head with the wrench and thereby caused a flow of blood, Dr. Broadhurst attempted to stanch the flow with a shirt which Williams handed him. If Dr. Broadhurst was engaged in mopping blood from his head, we can understand how the shot could have entered the armpit, but if he was advancing with a knife in his hand, it is difficult to perceive how shot could have entered his armpit.

It will be observed that the death was brought about in accordance with the carefully worked out plan; that is, first, Dr. Broadhurst was struck upon the head with the wrench, and then he was shot.

We do not believe that the State vouched for the credibility of Williams. As we have seen, § 2-1001, subd. 4, O. C. L. A., says that an accomplice's testimony must be "viewed with distrust," and § 26-939 holds an accomplice in such low esteem that the defendant could not be found guilty upon Williams' testimony alone. Section 4-709 permits a party who produces a witness to "contradict him by other evidence." Williams' testimony concerning the number of blows which he administered upon the head of Dr. Broadhurst was effectively contradicted.

Section 2-204, O. C. L. A., says:

"A witness is presumed to speak the truth. This presumption, however, may be overcome by the manner in which he testifies, by the character of

his testimony, or by evidence affecting his character or motives, or by contradictory evidence; and where the trial is by the jury, they are the exclusive judges of his credibility.''

According to Wigmore on Evidence, 3d Ed., § 897:

"The primitive notion that a party is morally bound by the statements of his own witnesses, no longer finds defendants.''

We read in 23 C. J. S., Criminal Law, § 909:

"The jury, in considering such testimony, have a right to consider all the surrounding circumstances, and the prosecution may claim that a part of the testimony of its witnesses is true and the rest false, according as the jury shall find on all the evidence.''

We do not believe that the State was bound by the part of Williams' testimony in which he said that he struck only one blow and had quit the fight before he fired the gun.

■ An aggressor, in a combat which led to the death of the assaulted party, can not claim that he struck the fatal blow in self-defense unless, before the blow, he withdrew in good faith from the combat, and, in addition, brought home to the assaulted man notice of his intention in such a way that the adversary, as a reasonable man, must have known that the assault was ended. Abandonment of the assault and reasonable notice thereof are essential to restore to the aggressor the right of self-defense. Vol. 40, C. J. S., Homicide, § 121, page 995, in stating the rule to which we are adverting, says:

" * * * He must also in some manner make known his intention to his adversary; and if the circumstances are such that he cannot notify his

adversary, as where the injuries inflicted by him are such as to deprive his adversary of his capacity to receive impressions concerning his assailant's design and endeavor to cease further combat, it is the assailant's fault and he must bear the consequences. As long as a person keeps his gun in his hand prepared to shoot, the person opposing him is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault. * * * "

In 26 Am. Jur., Homicide, § 135, page 247, we find:

" * * * Nor is this all; the aggressor must inform his antagonist of his purpose to withdraw from the conflict. If the circumstances are such that he cannot do this, it is attributable to his own fault and he must abide by the consequences."

Both of the treatises from which we quoted cite in partial support of their statements *People v. Button,* 106 Cal. 628, 39 P. 1073, 28 L. R. A. 591, 46 Am. St. Rep. 259. That decision is carefully reasoned and fully supports the claims made for it.

■■ If Williams had quit the combat before he shot Dr. Broadhurst, he did not manifest that fact in any way whatever, with the exception of walking a few steps to his automobile. But upon the seat of the car lay his gun ready to be fired. At the moment when he claims Dr. Broadhurst advanced upon him he still had the wrench in his hand. His own words are, "When he started after me I had the wrench in my hand." There is no evidence that Dr. Broadhurst, upon whose head three vicious blows had rained, one of which fractured his skull bone, had regained consciousness when he is said to have begun an attack upon his assailant. Unless Dr. Broadhurst in some miraculous manner had regained consciousness and had discovered

the secret purpose of Williams to abandon the assault, the right of Williams to act in self-defense had not been restored. Williams was asked: "Was he pretty well recovered when you handed the shirt to him?" He answered, "No." The nearest he came to attributing consciousness to the battered, bloody victim of his brutal blows was made in the following answer: "I had just got to the door and he started to come after me, so I imagine he was coming out of it." If Dr. Broadhurst advanced upon Williams, then we think that the following, taken from *People v. Button,* supra, is applicable:

> "While the deceased had eyes to see and ears to hear, he had no mind to comprehend, for his mind was taken from him by the defendant at the first assault. Throughout the whole affray, it must be conceded that the deceased was guilty of no wrong, no violation of the law. When he attempted to kill the defendant, he thought he was acting in self-defense, and, according to his lights, he was acting in self-defense."

We are certain that the fifth and sixth contentions are without merit.

The second contention advanced by the defendant is:

> "Evidence of other crimes was inadmissible."

The basis of the contention, as stated in the defendant's brief, was the receipt of evidence showing that the defendant

> "had committed other and different crimes, ranging from bigamy to adultery, and extending from a point of time some months before the alleged homicide up to a few days before the actual killing."

Those crimes were the ones which the defendant began to commit when she and Williams went upon the

California trip. However, she began a like series of crimes when she married Dr. Broadhurst without having been divorced from Lt. Lincoln. This court has many times held that evidence which attributes to a defendant the commission of other crimes is not admissible if its sole purpose is to blacken his character. But it has also held that the admissibility of evidence which serves a material issue is not withheld from it merely because it shows that the accused committed collateral crimes. The attacked evidence, in our opinion, served legitimate purposes. It showed the intimate relationship which existed between the defendant and Williams. People do not enter into partnership, criminal or otherwise, unless they are congenial to one another. This evidence showed that this partnership was formed while the two were in lecherous embrace and the manner in which the defendant secured dominance over Williams. It also cast light upon the defendant's motives. We hold that this contention is without merit.

 The fourth contention is:

"It was error for the Court to tell the jury as a matter of fact that Williams was a co-conspirator with the appellant."

The tenth contention, which can be conveniently considered with the fourth, presents two propositions. The first of the two is:

"The Court erred in giving Instruction No. X."

The part of that instruction which the defendant challenges follows:

"The witness, Alvin Lee Williams, who is alleged to be the actual perpetrator of the crime charged in the indictment, would be an accomplice in the meaning of the statute."

The second proposition is:

"The Court erred in giving Instruction XII."

The part of the instruction which the defendant attacks stated:

"It is not necessary to show by independent proof a link between an accomplice's testimony and the corroborating proof."

We shall now consider the above-quoted four contentions. The undertone which runs through them is thus stated in the defendant's brief:

"Whether or not appellant and Williams were co-conspirators or one was the accomplice of the other, were matters of fact for the jury to find, and presented an issue in which the State had the burden of proof. This was an important and crucial issue, * * * and for the Court to announce, as shown above, that Williams was a 'coconspirator' was most prejudicial."

The challenged remark was made when Mr. C. Crockett was upon the witness stand. He was asked concerning Williams as follows: "I will ask you to state what was said and what was done by this young man." The defendant objected upon the ground, "not binding at all upon the defendant." After colloquy the objection was overruled. Immediately following the ruling defendant's counsel reiterated his objection and at that juncture the trial judge said:

"You may make that objection, but this testimony goes to the declaration of a coconspirator which was made prior to the commission of the act."

It is that statement to which the defendant excepts. It will be seen that it was addressed to counsel, not to the jury. It would have been better if some term

such as "alleged coconspirator" had been employed. Throughout the trial the trial judge took unusual pains to point out to counsel the reason for his rulings. In this particular instance, it will be seen that after he made a ruling it was challenged and thereupon he stated the above as his reason.

We shall now go to the instructions, and in our course will quote from the aforementioned Instructions X and XII. At the very outset the instructions told the jury that a material averment of the indictment was that "the defendant, Gladys Broadhurst, aided. and abetted the said Alvin Lee Williams in the commission of the murder." They continued:

"You are to determine whether or not there has been a criminal homicide and if so, you are next to determine if the defendant aided and abetted in the commission of the same."

In other words, the issue as to whether or not the defendant aided and abetted Williams was submitted to the jury. In fact, the instructions submitted that issue in various language time after time. The instructions also told the jury:

"If, during the progress of this trial, at any time or in any manner, you have thought that you knew how the Court felt with reference to any fact in this case, you are to remove that entirely from your mind; because the law does not give to me nor have I the right to exercise any control over you in the determination of the facts in this case. The law of this state says that you are the sole and exclusive judges of the facts. * * *"

The charge also told the jury:

"For one person to abet another in the commission of a criminal offense simply means to knowingly and with criminal intent aid, promote and

encourage or instigate by act or counsel or by both act and counsel the commission of the offense. The defendant in this case is to be convicted, if at all, upon all proof received by you which would convince you beyond a reasonable doubt that she, by some positive and affirmative act of her own, aided and abetted Alvin Lee Williams in the commission of the crime charged in the indictment * * *. Applying this definition to the present case, in order to find the defendant guilty you must find beyond a reasonable doubt that she either advised, counseled, procured or encouraged the said Alvin Lee Williams to commit the act charged.''

That charge was given to the jury three times in virtually the same language as that just quoted. Other instructions, couched in different words, conveyed to the jury the same conception of their duty. The instructions continued:

''It is not enough that the defendant might have known of the criminal intent and purpose of the said Alvin Lee Williams or that, knowing of such criminal intent and purpose, she failed to prevent the same or to disclose such intent or purpose to other persons; but the evidence must satisfy you beyond a reasonable doubt that the defendant actually, intentionally, purposely and premeditatively aided and abetted in the commission thereof.''

After the instructions had made it clear that it was for the jury to determine whether or not the defendant was an aider or abettor they took up the matter of the credit, if any, to be attached to an accomplice's testimony. They told the jury that ''the laws of this state provide'' that an accomplice's testimony must be viewed with distrust, and then, going on, said:

''The witness, Alvin Lee Williams, who is alleged to be the actual perpetrator of the crime

charged in the indictment, would be an accomplice in the meaning of the statute.''

The effect of that charge was to bring Williams within the scope of § 2-1001, subd. 4, O. C. L. A., and require the jury to view his testimony with distrust. Since the State depended much upon Williams' testimony to prove the purported conspiracy, the defendant could not have been injured by the words just quoted. The instruction, at considerable length and in well chosen words, told the jury of the manner in which they should weigh Williams' testimony. They told the jury, for instance, that they should take into consideration "the interest, if any, he may have in the case.''

Next, the instructions told the jury of our statute which requires corroboration of an accomplice's testimony in order to render possible a verdict of guilty. In proceeding, they said:

"Alvin Lee Williams is an accomplice within the meaning of the statute.''

That was tantamount to a peremptory charge that his testimony alone could not warrant a conviction.

We do not believe that the issue as to whether or not the defendant was a coconspirator was taken from the jury. We are satisfied that it was submitted to the jury in language which they could not fail to understand. The defendant criticizes the instructions concerning the alleged conspiracy on the ground that that part was argumentative. We have read the instructions carefully and do not believe that the criticism is well founded. Nor do we believe that the twelfth instruction is subject to the criticism offered by defendant's counsel. We find no merit in the fourth contention.

The seventh contention says:

> "The Court erred in admitting evidence of trans-
> actions involving the defendant which occurred
> after the alleged homicide."

Under that contention, the defendant attacks many rul-
ings which were made during the trial. The first
occurred when the district attorney asked Sheriff Glenn
whether or not, on October 19, he talked with Williams
relative to a wrench. After the witness had answered
"yes", defendant's counsel moved to strike on the
ground of "incompetent, irrelevant and immaterial.
It is an attempt now to introduce hearsay testimony."
The motion was denied and shortly the trial judge
declared:

> "I am not admitting any statements or any
> testimony of Alvin Lee Williams at this time but
> the Court is holding that any actions that were
> performed by any witnesses there, even though
> information was learned from Williams, they can
> testify to what they did, but not as to any of the
> conversations."

The witness, in response to a further question, swore
that he was unable to find the wrench. He disclosed
nothing concerning anything that Williams said or did.
The second ruling attacked by this contention occurred
while Mrs. Adams was testifying. She swore that
Tuesday, October 15, she saw the Model A Ford. She
was then asked to state where. At that point defend-
ant objected "to testimony of any activities of Wil-
liams on Tuesday or any time thereafter because it
is after the alleged conspiracy." The objection was
overruled and the witness answered: "In the back-
yard at the Caldwell ranch." Presently she was
asked: "Did you note its color?" The objection was
renewed, and the witness replied: "It was a dull color,

dark color, green." It will be seen that she was neither asked nor disclosed anything about Williams. The third ruling attacked by this contention occurred while Williams was testifying. It seems that two months after his arrest he accompanied the officers upon a search for the knife with which he claimed that Dr. Broadhurst had attacked him after he (Williams) had struck Dr. Broadhurst. The following, taken from the record, discloses the challenged ruling:

"Q. And do you recall an instance later on involving a search for this knife, Mr. Williams?

"A. Yes, I do.

"Q. Will you tell us about that?

"Mr. Gallagher: We object to this testimony of actions which occurred after the occurrence of the alleged homicide as incompetent, irrelevant and immaterial.

"The Court: Objection is overruled. He may testify.

"A. About two months afterwards I took the officers back to the spot where I thought I had thrown the knife out.

"Q. Who were the officers that went with you?

"A. Mr. Koopman and Mr. Barkley.

"Q. Go ahead and tell us what happened.

"Mr. Gallagher: May we have a continuing objection?"

Some colloquy then occurred and eventually the witness gave the following answer:

"Well, we stopped where I thought the knife was and we got out and searched but just a short time until we found it."

No point was made by defendant's counsel of the witness's use of the term "I thought."

We shall not set forth further any of the remaining rulings with the exception of one. The omitted ones are no different in nature from those we have already portrayed. The remaining one to which we shall now go occurred while Williams was still upon the witness stand. This part of his testimony was concerned with Tuesday evening, the day after the homicide when he and the defendant were together. He was asked:

"Do you remember whether or not you had any discussion about going out on the search?"

Defendant's counsel objected:

"Acts taking place after the consummation of the alleged conspiracy."

Williams replied:

"Yes, we had some conversation about that."

After another question had been asked, he added:

"I think that was Tuesday night, Mrs. Broadhurst asked me if I didn't think that I had ought to go out and pretend to help with the search, to kind of cover up, and I told her yes, I thought that would be a good idea, but I couldn't be sure whether there was any more said about that or not."

We do not believe that any of the challenged rulings were erroneous. The search for the wrench was clearly material. The mere fact that Williams accompanied the searchers did not deprive the testimony of its admissibility. The same observation is applicable to the search for the knife. The fact that the day following the homicide the car which had been used in the commission of the crime was painted a new color so as to render identification difficult was material. Substantial evidence indicates that the defendant suggested that the painting should be done. Williams'

testimony that the defendant, on Tuesday evening, recommended that the two go to the scene of the search and "pretend to help" was not deprived of its admissibility because it was made to an accomplice. It was material because it showed an effort to simulate innocence. We are satisfied that the seventh contention is without merit.

The ninth contention is:

"The Court erred in permitting the witness Lola Adams to testify regarding the appearance and attitude of deceased in September, 1946. And also erred in permitting Mrs. Lincoln to testify about remarks and statements of defendant in 1945."

The testimony of Mrs. Adams concerned the day in September, 1946, when Dr. Broadhurst returned home from his short visit with the defendant in the Big Chief Auto Camp in Truckee, California. It will be remembered that the defendant left Caldwell for California with Williams as chauffeur August 5 and did not return until September 22. In the latter part of August Dr. Broadhurst made a short visit to the defendant and was home again in early September. Mrs. Adams saw him when he returned. As a witness, she was asked:

"And without repeating any conversations Mrs. Adams, can you tell us what the attitude and demeanor of Dr. Broadhurst appeared to be following his return?"

Defendant's counsel objected:

"This is objected to as hearsay testimony, a conclusion of the witness, incompetent, irrelevant, immaterial, calling for hearsay testimony."

The ruling was:

"She can testify as to what he did and as to actions and what he did, as to his reactions. I will

permit her to testify as to his actions but not as to any statements or anything of that kind."

The material part of the answer was:

"After Dr. Broadhurst returned from California he seemed very much upset and very worried and very heartbroken in fact."

The remaining part of the answer was stricken by the presiding judge upon his own motion as not responsive. No part of Mrs. Adams' answer is attacked as nonresponsive.

From Wharton's Criminal Evidence, 11th Ed., § 1013, we quote:

"It is generally held that a witness may testify as to emotions manifested by another and observed by him."

We believe that the answer was material. It concerned an occasion only two or three weeks before Dr. Broadhurst opened the joint bank account and wrote his will. The challenged ruling is free from error.

■ The attacked testimony of Mrs. Lincoln quoted a remark made by the defendant in 1945 to Mrs. Lincoln that Aunt Mary had left her a fortune of three million dollars and that the estate was being probated. The remark was made while the defendant and Dr. Broadhurst were engaged in correspondence and before they were married. We do not believe that the question which brought forth this testimony was vulnerable to the defendant's objection of remoteness.

Although we have given the entire caption placed by the defendant upon this contention, nevertheless, her brief includes within this contention a claim that error was committed when an instruction requested by her upon the subject of circumstantial evidence was not

given to the jury. We think that the requested instruction was properly refused: (a) it was argumentative, and (b) the instructions which were given upon the subject of circumstantial evidence were fair, complete and accurate.

■■■ The eleventh contention follows:

"The Court erred in admitting the various papers, letters and documents found in the Broadhurst home and taken after the arrest and incarceration of the appellant in violation of her rights under the 4th amendment of the Constitution of the United States and Sec 9 of Article I of the Constitution of Oregon."

Three days prior to her trial the defendant filed a petition praying for a return to her of the articles with which this contention is concerned. It was denied.

The articles were obtained by the State in the following ways: (1) Some were in the defendant's purse at the time of her arrest and were taken as an incident of the arrest. Among these articles were the letter which Dr. Broadhurst wrote to the defendant shortly after their marriage in which he expressed fears that "that brute" (the nonexistent twin brother) would injure the defendant. (2) Some were voluntarily handed to the officers by Mrs. Adams after the defendant's arrest. Among these items was a photograph of Mrs. Mary Johnson (Aunt Mary). (3) Some were taken from the heat register in the room in the Broadhurst home previously used by the defendant. This was done after the defendant's arrest and after Dr. and Mrs. Adams had invited the officers to their home. Among the articles taken from the heat duct was a slip of torn paper which matched perfectly with the paper upon which the Sweet Pea note was written.

As we stated in a preceding paragraph, the home in which Dr. Broadhurst resided was owned by him, but about a year before his death he gave its use and occupancy to the Adamses. They defrayed all of the household expenses and he was their guest.

Taking from the defendant, at the time of her arrest, her purse and taking from it its contents was not an unlawful search: *State v. Laundy,* 103 Or. 443, 204 P. 958, 206 P. 290, and *State v. Cram,* 176 Or. 577, 160 P. (2d) 283, 164 A. L. R. 952.

Dr. and Mrs. Adams needed no search warrant to justify them in searching their own home, nor did they need a search warrant to justify them in inviting to their home any guests, even though the latter were police officers: *State v. Hilton,* 119 Or. 441, 249 P. 1103; 56 C. J., Searches and Seizures, § 68, p. 1182. We are satisfied that the petition to suppress evidence was properly denied. This contention is without merit.

■ The twelfth contention is:

"The Court erred in refusing to quash the indictment or to allow an examination of the proceedings before the grand jury."

In support of that contention, the defendant argues that the evidence upon which the grand jury acted was insufficient to warrant the return of a true bill. We find that this contention is without merit: Section 26-824, O. C. L. A., and *State v. Kelliher,* 49 Or. 77, 88 P. 867.

■ The thirteenth, being the last, contention is:

"The verdict is against the weight and preponderance of the evidence."

From what is said in preceding paragraphs it necessarily follows that, in our opinion, this contention is without merit.

We carefully read the lengthy record. We gave studious attention to the printed briefs, 607 pages long, and to all of the authorities cited in them. It is our belief that the defendant had a fair trial, that she was represented by able counsel, and that no errors were committed against her. The trial judge, in an effort to give the defendant the benefit of every doubt, even submitted to the jury the issue as to whether or not Williams shot Dr. Broadhurst in self-defense. Concerning the tone of that instruction, no one but the State could complain. We are satisfied that the record is free from error.

The judgment of the circuit court is affirmed.